**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


**MARIA Y. VELOS,**

        **Plaintiff,**

**vs.**                                                                                       **Civil No. 05-0710 RLP**


**JO ANNE B. BARNHART, Commissioner**
**of the Social Security Administration,**

        **Defendant.**

**MEMORANDUM OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION TO REVERSE AND REMAND**
**ADMINISTRATIVE AGENCY DECISION**

        Plaintiff Maria Y. Velos brings this action pursuant to §42 U.S.C.  405(g) seeking judicial review of the decision of Defendant, the Commissioner of Social Security, to deny her applications for disability insurance benefits under Title II ("DIB") and supplemental security income under Title XVI ("SSI") of the Social Security Act.  For the reasons stated herein, Plaintiff's Motion is denied.

## *I.  Procedural Background*

        Plaintiff's claims for DIB and SSI benefits were filed on  August 23, 2002, and February 24, 2004, respectively (Tr. 51, 253), and were denied at the first and second levels of administrative review.  (Tr.  27,  28).  A hearing was conducted by an administrative law judge (ALJ)on September 30, 2004  (Tr. 260-285).  On  January 18, 2005, the ALJ filed a written decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 10-20).  On April 27, 2005, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final determination of the Commissioner. (Tr. 5).  Plaintiff filed her Complaint before this court on June 25, 2005, challenging the denial of her claims for benefits.

## II.   *Standard of Review*.

Judicial review under §42 U.S.C. 405(g) is limited to whether the decision of the Commissioner of Social Security  is supported by substantial evidence in the record as a whole and whether the Commissioner applied correct legal standards when evaluating the claimant's claim. *See White v. Massanari*, 271 F.3d 1256, 1257 (10th Cir.2001) (*citing Castellano v. Sec'y of HHS.*, 26 F.3d 1027, 1029 (10th Cir.1994)). The Tenth Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (q*uoting Castellano*, 26 F.3d at 1028). In the course of its review, the court may not reweigh the evidence or substitute its judgment for that of the defendant. *Id.*

## III.   *Factual Background*

Plaintiff was born on August 29, 1955. (Tr. 51).  She completed the 10th grade (Tr.261), and has past work experience as a cook and restaurant owner.  (Tr. 62, 262-263).

### A.  *Medical evidence prior to alleged date of onset of disability*

Plaintiff has a long history of obesity, vascular insufficiency affecting her lower extremities, hypertension and hypothyrodism (See, e.g., Tr.149, 154-155).  Hypertension and hypothyrodism have been treated with medication and monitoring.  (See, e.g., Tr. 155, 149, 208, 150-151, 204-205, 202, 144, 194, 193, 191, 185-186, 246, 181, 241, 232, 230).

From November 1998 to August 2001, Plaintiff worked as a cook in a restaurant that she co-owned.  This job required her to be on her feet 8 hours a day, 6 days a week, and lift up to 100 pounds.  (Tr. 70, 72, 263-264).  Plaintiff underwent vein stripping of her legs for varicose veins in October 2000, and thereafter was treated with anti-coagulation therapy.  (Tr.  64, 155, 150).  She continued to experience edema with sluggish pulses in her legs, and had to wear support stockings

due to continued venous insufficiency.  (Tr.  154, 152, 147).

Plaintiff was evaluated for knee pain by Carrie Flury, a physicians' assistant, in January 2002.

(Tr. 143).  Ms. Flury ordered x-rays, which showed minimal osteodegenerative spurring.  (Tr. 166).

On February 18, 2002, Ms. Flury evaluated Plaintiff for a viral illness. Plaintiff's ability to work was

discussed, during this visit:

> We . . .talked at length that I feel she can go back to work now. . . .I don't want her
> out there lifting 50 pound weights or anything like that, but she definitely can be in a
> situation where part-time job or full time where she actually gets breaks where she can
> be off her feet where she can elevate them so they don't become edematous. . .I think
> she is going to start looking for work.

(Tr. 142).

Plaintiff began working in a hospital kitchen in March 2002, in a job that required her to be

on her feet 7 ½  hours per day and lift up to 50 pounds.  (Tr. 70-71, 251, 263-264). By April 2002,

she complained of constant knee pain, and walked with a limp.  (Tr. 159).  Dr. Sonia Brown-

Shephard referred her to physical therapy on April 17, 2002, and indicated that she could return to

work on May 2, 2002.   (Tr. 157-160, 195).  Physical therapy was discontinued on May 31, 2002.

Plaintiff advised her therapist that although therapy decreased her pain complaints, her pain returned

as soon as she had to be on her feet at work, and lasted until she rested and kept her legs elevated.

(Tr. 157).

On June 18, 2002, Plaintiff was again seen by Dr. Brown-Shephard, who diagnosed severe

varicose veins with stasis dermatitis[1].  Dr. Brown-Shephard encouraged daily use of support

stockings with extra compression and advised Plaintiff to elevate her legs as much as possible.  (Tr.

---

[1]Skin condition caused by fluid build up under the skin, caused in turn by venous insufficiency.
www.nlm.nih.gov/medlineplus/ency/article/000834.htm.

193).

> ### B.  Medical evidence following alleged date of onset of disability

Plaintiff's last day of work was on August 13, 2002.   In a disability report submitted on August 21, 2002, she stated that she stopped working because  she was not allowed to work fewer hours, or to sit for 20-30 minutes every two hours as directed by her doctor.  (Tr. 61, 251).  In her Reconsideration Disability Report, she stated that she was unable to stand or walk for any period of time because of pain and swelling.  (Tr. 92).  An examination by Dr. Brown-Shephard on August 13 documented edema, severe varicose veins and stasis dermatitis.  She advised Plaintiff to elevate her legs as much as possible, monitor for breaks in her skin, wear support stockings, exercise and lose weight.  (Tr. 189).

Plaintiff saw Dr. Maximo Torres on September11, 2002, seeking a surgical referral for treatment of her legs.  At that time she had no pain complaints.   Dr. Torres prescribed support stockings and Trental to treat stasis dermatitis.  (Tr. 187).  When re-evaluated two months later, plaintiff had no pain complaints, but had developed changes on her left foot indicative of intermittent claudication.[2]  She had not obtained the previously prescribed support stockings or medication.  They were again prescribed.  (Tr. 186).

By March 28, 2003, Plaintiff complained of ankle swelling "off and on."   Examination documented pedal edema, varicose veins and sluggish pulses.  Venous insufficiency was diagnosed and she was told to use full support thigh hose and counseled on diet, exercise and weight reduction. (Tr. 246-247).

Plaintiff was evaluated by Dr. Monem Gillan on July 11, 2003 for chest pain.  Cardiac work

---

[2]Arterial blockage  in the legs.  www.nlm.nih.gov/medlineplus/ency/article/003184.htm.

4

up was negative and her hypertension was under control.  Examination of her legs showed no edema.  Dr. Gillan recommended that Plaintiff lose 160 lbs.  (Tr. 182).  Chest pain has resolved by August 2003, and physical examination showed no leg edema, no calf tenderness and normal range of motion.  Dr. Gillan  placed Plaintiff on a diet.  (Tr. 181).

Plaintiff developed pain, swelling and diminished pulses of her left lower leg on  September 30, 2003.  After a Doppler test[3] ruled out a deep vein thrombosis she was diagnosed with phlebitis[4], and  advised to elevate her legs for one week.  (Tr. 237-240).  The phlebitis resolved as of October 15, 2003.  (Tr. 235-236).  In December 2003 Plaintiff developed eczema on her right foot, which resolved with treatment (Tr. 232-233).

Plaintiff was treated for back pain with muscle spasm in May 2004.  This was felt to be due to mild osteoarthritis, compatible with her age.  Examination of her extremities documented  no tenderness or edema, and her pulses were normal.  (Tr. 228-229).

Non-examining state agency physicians evaluated Plaintiff's medical records on two occasions, and indicated that she retained the residual functional capacity for work that involved lifting up to 20 pound occasionally and 10 pounds frequently, standing and/or walking 2 hours in an 8 hour day, sitting six hours in an eight hours day, with occasional climbing, balancing, stooping kneeling, crouching and crawling,  (Tr.  171-179).  The non-examining physicians supported their assessment with the following explanation:

Claimant is morbidly overweight - 5'9" tall weighing about 300 pounds. She has

---

[3]An ultrasound examination of the blood flow in the major arteries and veins  in the arms and legs. www.nlm.nih.gov/medlineplus/ency/article/003775/htm.

[4] Inflammation of a vein.  www.nlm.nih.gov/medlineplus/ency/article/001108.htm.

severe varicose veins with sluggish pulses.  She is able to shop and go for 30 minute walks per day.  Hypertension and hypothyroidism are controlled with meds.  Claimant complains of right knee pain.  X-rays show minimal osteodegenerative spurring. (Tr. 172).

At follow up in 7-03, there had been some improvement; peripheral edema had resolved.  Claimant's varicose veins are likely unchanged, and would still warrant restriction for no prolonged walking or standing. (Tr. 178).

Each fact cited by the non-examining physicians is supported by the record.

### IV.   *Five Step Sequential Evaluation Process.*

The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled.  *Williams vs. Bowen*, 844 F.2d 748, 750-52 (10th Cir.1988).  The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 & n. 2. At step one, the claimant must show that she is not presently engaged in substantial gainful activity; at step two that she has a medically severe impairment or combination of impairments; at step three that the impairment is equivalent to a listed impairment;  and at step four, that the impairment or combination of impairments prevents her from performing her past work. *Id.* at 750-52.  If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient residual functional capacity to perform work in the national economy, given her age, education and work experience. *See id.* at 751 & n. 2.

### V.   *The ALJ's Decision*

The ALJ followed the sequential process, reviewing the relevant evidence which included testimony from a vocational expert, the medical evidence, and Plaintiff's testimony.  The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act because she retained the

residual functional capacity for work jobs which existed in significant numbers.

    A.    *Substantial Gainful Activity.*

The ALJ concluded that Plaintiff had not engaged in any substantial work activity since her alleged date of onset of disability. (Tr. 19)

    B.    *Assessment of Impairments.*

When evaluating whether an individual has a severe impairment, the finder of fact must evaluate whether the claimant's impairment, or combination of impairments, significantly limits her physical or mental ability to do basic work activities. §§20 C.F.R. 404.1520(c) and 416.920(c). The ALJ found that Plaintiff had severe impairments consisting of status post vein stripping for venous insufficiency, hypertension, hypothyroidism and morbid obesity. (Tr. 15, 19). She also determined that Plaintiff's eczema did not qualify as a severe impairment. (Tr. 15). The ALJ concluded that Plaintiff's impairments, individually or in combination, did not meet or medically equal the level of severity of a listed impairment, discussing in detail Listing §4.11 - Chronic venous insufficiency, and §4.12 -Peripheral arterial disease.

    C.    *Residual Functional Capacity.*

Because a determination could not be made based solely on medical considerations at step three, the ALJ next determined whether Plaintiff "retain[ed] the residual functional capacity to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy." (Tr. 16)[5]. This evaluation involves the review of past relevant work and

---

    [5]"If we cannot make a decision based on ... medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled." §§20 C.F.R. 404.1520(e) and 416.920(e). "If you cannot do any work you have done in the past because you have a severe impairment(s), we will consider your residual functional capacity and your

other work available given a claimant's physical capabilities.

The assessment of residual functional capacity includes evaluation of a claimant's allegations. The ALJ found that Plaintiff was generally credible except to the extent her testimony indicated she could not perform sedentary to light work which allowed for occasional elevation of her legs.  In support of this credibility determination, the ALJ cited to Plaintiff's the following:

- Plaintiff's past relevant work which exacerbated her leg problems, in that it required at least medium level exertion and extensive walking and standing.

- The February 2002 notation from her medical care provider that she could return to full or part time work provided she not lift anything near 50 pounds and be able to have breaks in order to be off her feet so they don't become edematous.

- Improvement in Plaintiff's condition after she quit work which required prolonged standing.

- Continued venous insufficiency which improved with therapy, including the use of compression stockings.[6]

- Plaintiff's statements that prolonged standing limited her ability to work. (See Tr. 61, 63).

- Plaintiff testified that her medications cause drowsiness to such an extent that she was

_____

age, education, and past work experience to see if you can do other work.   If you cannot, we will find you disabled." §§20 C.F.R.  404.1520(f)(1) and 416.920(f)(1).

[6]The ALJ also cited to surgery performed in September 2002.  My review of the records does not disclose any surgery during that period, although information provided by the Plaintiff may have contributed to confusion on this point. Plaintiff indicated in written materials submitted in August 2002 that she had an appointment to see Dr. Paul Whitwam in September 2002, and that he treated her with surgery. (Tr. 63).

not able to drive.  (Tr. 279-280).  The ALJ pointed out that Plaintiff had never

reported medication side effects to her attending physicians.

The ALJ found Plaintiff had the residual functional capacity to

lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or
walk at least two hours in an 8 hour day; . . .push, pull and perform gross and fine
manipulation without significant limitation; occasionally climb, balance, stoop, kneel,
and crawl; no climbing of ladders, ropes or scaffolds; and, have the ability to elevate
her legs to stool level.

(Tr. 17-18).

The ALJ examined Plaintiff's past work in light of this residual functional capacity, and determined

that Plaintiff could not perform her past relevant work.  (Tr. 18)  At this point, the burden of proof

shifted to the Commissioner to prove the existence of significant number of jobs in the economy

which Plaintiff could perform given her physical impairments.  *See Frey v. Bowen*, 816 F.2d 508, 512

(10th Cir.1987).  The ALJ exercised her prerogative to use a vocational expert to help evaluate those

prospective jobs.  See §§20 C.F.R.  404.1566(e) and 416.966(e).  The vocational expert testified that

an individual with the Plaintiff's vocational factors of age, education and past work experience, who

retained the residual functional capacity described above, could perform the jobs of production line

assembler[7] with a sit/stand option and  eyeglass assembler.[8]  (Tr. 281-285).  The vocational expert

testified that these jobs would permit an individual to elevate her feet on a stool under the work table

as much as she wanted to.  (Tr. 285).

The ALJ found that Plaintiff could perform jobs that existed in significant numbers in the

[7]DOT 739.687-013, light and unskilled;  2,000,00 in the national economy, 16,000 in New
Mexico.

[8]DOT 713.687-018, sedentary and unskilled; 200,000 in the national economy, 2,000 in New
Mexico.

regional and national economy with her established limitations, and concluded Plaintiff was not

"disabled" within the meaning of the Social Security Act.  (Tr. at 19-20).

## VI.   Issues Raised[9]

A.    Whether the ALJ correctly applied the treating physician rule.

B.    Whether the ALJ's credibility determination is supported by substantial evidence and the application of correct legal principles.

C.    Whether the ALJ's residual functional capacity assessment is supported by substantial evidence.

D.    Whether the hypothetical question posed to vocational expert included all of Plaintiff's impairments.

## VII.   Discussion

A.    *The ALJ Applied Correct Legal Principles in Evaluating the Evidence of Treating Physicians.*

Plaintiff argues that the ALJ improperly rejected her treating physician's opinion that she was

unable to sit or stand for any period of time, and must elevate her legs over her heart level.  There

is no medical evidence to indicate any treating physician ever had such an opinion.

"An ALJ is required to give controlling weight to a treating physician's well-supported

opinion, so long as it is not inconsistent with other substantial evidence in the record."  *Drapeau v.*

*Massanari*, 255 F.3d  1211, 1213 (10th Cir.2001) (citing §20 C.F.R.  416.927(d)(2)); see also §20

---

[9] The Plaintiff raised for the first time in her Reply brief the claim that the ALJ failed to consider the combination of her impairments in  evaluating whether she had a listed impairment.  In addition to this contention being absolutely incorrect (See Tr.15-16), a party is prohibited from raising new arguments and issues in a reply brief. *Boilermaker-Blacksmith Nat. Pension Fund v. Gendron*, 67 F.Supp.2d 1250, 1257 n. 4 (D.Kan.1999), and a court is not to consider issues first raised in a reply brief, *Plotner v. AT & T Corp.*, 224 F.3d 1161, 1175 (10th Cir.2000). Accordingly I decline to address this argument first advanced in the Plaintiff's reply brief. *See United  States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 n. 5 (10th Cir.1999).

C.F.R. 404.1527(d)(2). None of Plaintiff's treating physicians indicated that she was unable to work. On the contrary, Dr. Brown-Shephard indicated Plaintiff could return to work, and the limitations found in Ms. Flury's February 18, 2002 note indicate that Plaintiff could perform work that was less strenuous than the medium to heavy kitchen work she had been performing.(Tr. 142, 251).

I find that the ALJ properly considered the opinions of Plaintiff's treating care givers, and that she incorporated their opinions in her evaluation of Plaintiff's  impairments.

        B.       *The ALJ's Credibility Determination Is Supported by Substantial Evidence and the Application of Correct Legal Principles.*

In reviewing the credibility determination, the Court should  "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec'y of HHS*, 933 F.2d 799, 801 (10th Cir.1991).  Credibility is the province of the ALJ. *Hamilton v. Sec'y of HHS*, 961 F.2d 1495, 1499 (10th Cir.1992).  At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995).  *But see Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir.2000) (Kepler does not require formalistic factor-by-factor recitation of evidence). Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.  *Kepler*, 68 F.3d at 391.   In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements.  See Social Security Ruling 96-7p, 61 Fed.Reg. at  34486.  Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible."  *See id.*

The ALJ found that Plaintiff suffers from severe impairments which prevent her from performing work at the medium exertional level.  (Tr. 17).  The ALJ properly considered the medical

evidence and assessed Plaintiff's credibility regarding the extent of her functional impairments. *See Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir.1990) (ALJ entitled to examine medical record and evaluate claimant's credibility in determining whether impairment is disabling). The ALJ noted that no care provider had limited Plaintiff's activities to the disabling extent she claimed, and in fact medical care providers felt she had a capacity for work. The ALJ noted that Plaintiff originally claimed that she was incapable of prolonged standing. This is qualitatively different than the level of disability Plaintiff subsequently claimed - that she could not sit, stand or walk for any period of time. The ALJ noted that contrary to Plaintiff's testimony, there was no evidence in the record she suffered any adverse medication side effects, and in fact, no complaint regarding medication side effects appears in the medical record.

Based on the foregoing, I find that the ALJ applied correct legal principles in her evaluation of Plaintiff's credibility, and that her evaluation is supported by substantial evidence.

C.   *The ALJ's Residual Functional Capacity Assessment Is Supported by Substantial Evidence.*

Residual functional capacity is what an individual can still do on a regular and continuing basis despite her impairments, and is based on relevant evidence. §§20 C.F.R. 404.145, 416.945. Plaintiff's treating care givers indicated that Plaintiff could work (Tr. 251) but had limitations in terms of weight lifted and amount of time she was on her feet. (Tr. 142). The opinions of non-examining physicians were consistent with the limitations assessed by treating care providers, and the non-examining physicians provided a legitimate rationale for specific exertional and non-exertional limitations they assessed. The ALJ incorporated the opinions of both treating and non-examining physicians, as well as admissions made by Plaintiff, in assessing residual functional capacity. I find

12

that the ALJ's residual functional capacity assessment is supported by substantial evidence and the application of correct legal principles.

D.      *The ALJ Posed a Complete Hypothetical Question to the Vocational Expert.*

Finally, Plaintiff claims that the hypothetical question posed to the vocational expert was incomplete because it did not include limitations of having to elevate her legs above her heart throughout the day, or drowsiness caused by medication.   This argument is without merit.

Hypothetical questions need only reflect impairments and limitations that are borne out by the evidentiary record. *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996).  As previously stated, there is no evidence in the medical record that Plaintiff was advised to elevate her legs above her heart level throughout the day.  Such a limitation is belied by the records of two medical care providers indicating that Plaintiff could work (Tr. 142, 251), as well Plaintiff's statement that doctor imposed work limitations consisted of sitting for 20-30 minutes every two hours.  (Tr. 61, 251).  Likewise, there is no evidence in the medical record of any medication side effects experienced by Plaintiff.

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision is DENIED.

                                            _____
                                               Richard L. Puglisi
                                            United States Magistrate Judge
                                                (sitting by designation)

13